UNITED STATES of America

v.

Dr. Isadore I. ROSEN.

Crim. A. No. 77–181.

United States District Court,
E. D. Louisiana.

Nov. 21, 1977.

---

Ronald A. Fonseca, Asst. U. S. Atty., New Orleans, La., for the U. S.

Jack Peebles and Ronald J. Rakosky, New Orleans, La., for defendant.

CHARLES SCHWARTZ, District Judge.

Dr. Isadore I. Rosen, a medical doctor, has been charged in a twenty-five count indictment with dispensing and distributing controlled substances in violation of Title 21, U.S. Code, § 841(a)(1). A jury was waived, and the case was tried to the Court.

■ In order for the Government to convict the defendant, it is necessary that it prove:

1. That defendant distributed or dispensed a controlled substance.
2. That he acted knowingly and willfully.
3. That he did so other than in good faith for legitimate medical treatment.

Defendant does not contest but in fact admits that the first two elements of the charged offense have been satisfied.

To the extent that any of the following findings of fact constitute conclusions of law they are adopted as such, and to the extent that the conclusions of law constitute findings of fact, they are adopted as such.

## SPECIAL FINDINGS OF FACT [1]

Defendant is 68 years old, graduated from medical school some 42 years ago and since 1951 has operated a clinic in Amite, Louisiana, a rural community approximately 73 miles from New Orleans and 50 miles from Baton Rouge. He claims to have given up a general surgery and obstetrics practice because of age. He further claims to have begun his obesity practice in earnest for the last seven years; that such portion of his practice has grown to approximately 60% of his practice. The counts described in the indictment are based upon the defendant's prescribing and/or delivering controlled substances to six law enforcement agents posing as patients on separate occasions between April 29, 1976 and March 7, 1977. The controlled substances are set out in the various counts of the indictment. The agents all utilized undercover names. The evidence reflects that all of the controlled substances which were mentioned in the indictment were either distributed to the agents or the prescription for same was subsequently filled by a pharmacist or druggist. Thus, the principal issue to be resolved by the Court is whether the Government has demonstrated by clear and convincing proof beyond a reasonable doubt that the dispensation of the drugs and the circumstances surrounding such dispensation as to each of the six undercover agents was not in good faith and not for legitimate medical treatment. The pattern of the doctor's operation was generally as follows:

Patients were not required to make an appointment in advance. A receptionist

---

1. No request has been made for special findings of fact to be set out by the Court pursuant to Rule 23(c). The Court, however, is of the opinion that considering the complexity of the factual situation, it is in the best interest of the parties and the administration of justice to make such findings, so that all concerned will be fully advised of the Court's basis for its decision.

"The requirement that a trial judge prepare findings which will cast light on his reasoning is not a trivial matter. It is an important element of fairness to the accused. As a distinguished trial judge has observed, 'The existence of a rationale may not make the hurt pleasant, or even just. But the absence, or refusal, of reasons is a hallmark of injustice.' [5] Moreover, the trial court's statement is an important element of judicial administration, because '. . . an appellate court must be able to ascertain the grounds for [a lower court's decision] in order to fulfill its responsibility of review.'" [6] *United States v. Snow*, 157 U.S.App.D.C. 331, 484 F.2d 811 (1973).

[5] M/E. Frankel, Criminal Sentences, at —— (to be published in April, 1973).

[6] *Tatem v. United States*, 107 U.S.App.D.C. 230, 232, 275 F.2d 894, 896 (1960).

would come to the waiting room and ask who was present for the obesity program. Those present for such program were then required to sign a register (a small spiral note book), and those who were there for the first time were also required to give the receptionist an identification card with their picture on it, usually, their driver's license. On the patient's first visit his name was transcribed onto a 3 × 5 card. The patient was then weighed on a 40 year old scale, his or her blood pressure was taken (in most instances by one of the doctor's employees, none of whom were registered nurses) and the information was thereafter transcribed on the 3 × 5 card. The other information placed on the card was the patient's address, the date of the visit, age, and the prescription given. No medical history of the patient was taken. Specifically, the patient was not asked whether he was allergic to any type of drugs, whether he had a heart condition or any other ailments which might affect him, anything in particular about his general health or previous illnesses, or illnesses from which he might be suffering at the time of the visit, his employment, etc., nor were any tests such as a hyperthyroid test[2] given. After the card was completed, the defendant proceeded to give a short stereotyped innocuous "lecture" relative to weight control, consisting primarily of telling the patients that they should reduce their food intake, drink plenty of water, chew their food slowly, loss of weight was accomplished primarily by using more calories than one consumes, and that exercise was necessary. In most cases he handed the patient a little yellow book about weight control. Usually these weight control "lectures" were given to several people at a time. Unless the patient was present by himself, these instructions were directed to the group as a whole with no attempt to individualize same. The defendant would call the patient to his desk which was in the same room where the lecture had been given, then discuss with the patient what type of prescription or pills he was going to give him, and then proceed either to give him a prescription or the pills. He received his fee for same in cash, but no record was made on the card of the amount charged each particular patient.[3] The doctor gave no specific instructions to the patient regarding the taking of the pills, except that which appeared on the label of the package or vial containing the pills.[4] The patient was not given an appointment for, and/or ever instructed with regard to follow up treatment. Thus apparently the patient was free to return or not return as the patient saw fit after receiving the pills. When the patient returned he was weighed (but his blood pressure was not taken). The only entry made on his 3 × 5 card on a subsequent visit was the date, the patient's weight and the prescription given. On a patient's subsequent visit no history was taken, no questions were asked as to whether there were any ill effects from taking the pills, and the only conversation between the patient and the doctor was a comment as to whether weight was gained or lost, and what type of drug would be prescribed. Sometimes pills or another prescription would be given when the patient had gained weight, and other times pills or prescriptions would be given when the patient lost weight. In most instances the defendant was careful not to prescribe pills at less than one-month intervals. Even those patients without local addresses were not asked who referred them to the clinic. The particular facts and circumstances (*in addition to the aforesaid*) relating to the receipt of pills by the six informants is as follows:

2. This is a simple test consisting of pinching the skin to determine by the wrinkles if the patient is subject to dehydration.

3. The doctor claimed that he kept his records for income tax purposes as follows: He put $30 in his pocket each morning and then during the day paid in cash certain expenses such as cokes, salaries, etc. He pocketed all fees received during the day. At the end of the day he would count the cash in his pocket, subtract $30 and enter such amount as his cash receipts for that day.

4. In some instances the package containing the pills distributed in the office set forth no instructions.

## AGENT LAWRENCE ANTOINE

On April 29, 1976, without prior appointment, Lawrence Antoine, (whose undercover name was Lawrence Angelo) accompanied by Special Agent Claude Smith, (undercover name Ron Harris) arrived at the defendant's office. After the attendant asked who was present for the obesity program, he, Agent Smith (Ron Harris) and three female patients went into the inner office. The male attendant asked for a picture I.D. They gave him their bogus drivers licenses [5] and then the doctor came in and said, "Listen up, everybody, I have to be out of here in five minutes." (Tr. p. 40). He then gave a two or three minute talk on weight reduction, the doctor weighed Agent Antoine with all his clothes on, and after discussion wrote him a prescription for 60 Biphetamine 20's (Count II of the Indictment). After Agent Antoine told the defendant that the "blacks keep him up all night," the defendant replied to the effect that "You kids know all about these uppers and downers, don't you," and wrote him an additional prescription for sixty Placidyl tablets or capsules (Count III of the Indictment). The doctor did not take a medical history from Agent Antoine or ask him about his past illnesses, his eating habits, his employment, allergies, etc. He was not told to come back or given any instructions as to how to take the medication. The witness returned on May 14, 1976, again with Agent Smith. They signed the register again, and were brought into the inner office with two female patients. On this occasion the doctor refused to give them any more pills because he said they came back too early and told them to come back at the end of the month. He returned on May 28, 1976, and was brought into the inner office and weighed. About five people were in the inner office and Dr. Rosen told him, "I am not going to give you any 'black mollies' this time because you only lost one pound." (Tr. p. 56). On that occasion he gave him two envelopes containing 30 pills each (Count IV of the Indictment). The witness told him that the "downers" he gave him last time were hard to swallow. Thereupon he wrote him a prescription for sixty Dalmane (Count V of the Indictment). On this visit his blood pressure was not taken, nor was he asked about the effects of the drugs that were prescribed on the earlier visit in April or anything else. On June 28, 1976, he returned to the doctor's office with Trooper Cindy Bell, an undercover agent who was masquerading under the undercover name of "Samantha Nix." He alone was ushered into the inner office with some males and females and asked if Trooper Bell could also be in the inner office at the same time as he was. The receptionist then ushered Trooper Bell in. Somewhat later the doctor came in and recognized Trooper Bell as a former patient by looking at her 3 × 5 card. Agent Antoine told the doctor he wanted to get back on his "black mollies" and that the reason he had only lost one pound was that he had given some to his girl friend. The doctor replied he did not care what the witness did with the pills and "let the cops bust you," and said he was going to keep him on the same drugs and reached into the drawer and gave him two bags of Phendimetrazine (Count XI of the Indictment). The witness asked him about his downers and he wrote him a prescription for sixty more Dalmane capsules (Count XII of the Indictment). His blood pressure was not taken at that time, nor were any tests performed. He was not questioned regarding the effects of his having taken the previous pills, nor was he told when to call back for another appointment. He came back again on July 27, 1976 along with Trooper Bell. He again told the witness that he did not care if he gave the pills to his girl friend (Tr. p. 71). On this occasion he wrote the witness a prescription for sixty Ionamin capsules (Count XIII of the Indictment). Again the doctor did not take his blood pressure, inquire about the effect of the drugs, or advise him as to whether or not he should come back to the clinic.

5. His address was listed as 258 E. Babylon St., Kenner, La. (a suburb of New Orleans).

## CINDY BELL

Cindy Bell[6] had seen the defendant on three occasions prior to her accompanying Agent Lawrence Antoine to Dr. Rosen on June 28, 1976, to-wit on September 8, 1975, when she obtained 30 Phendimetrazine tablets and on September 19, 1975, when she obtained 30 Phendimetrazines and on November 4, 1975 when she received 31 Biphetamines. After taking her weight and blood pressure but no other medical history, the defendant commented about her having lost only one pound since her previous visit and remarked that diet is more important than pills and gave her thirty Phendimetrazine tablets (Count X of the Indictment). On July 27, 1976 she returned again with Lawrence Antoine. The defendant, after looking at her patient card, made a remark about her only losing two pounds, and prescribed 31 Ionamin. However, no blood pressure was taken; no history was taken, no questions were asked, no directions were given and no tests were performed (Count XIV of the Indictment).

## CLAUDE SMITH

Claude Smith (undercover name Ron Harris) went to the doctor's office on April 29, 1976 accompanied by Lawrence Antoine. He was asked to show a picture identification card[7] and thereafter his weight and blood pressure were taken and he was ushered into the doctor's inner office with three female patients. Other factors which transpired relative to this visit are described heretofore in connection with the description of the facts and circumstances relative to the dispensing of the pills to Agent Lawrence Antoine. The doctor turned to Claude Smith and asked if he wanted Preludin and when he said yes, the doctor replied he does not give such pills. The patient then said, "I need some diet pills." The doctor responded, "O.K., you can stay," (Tr.

pp. 165–166) and thereupon gave him two envelopes, each containing a total of thirty Phendimetrazine (Count I of the Indictment). Other than weight and blood pressure being taken, no other medical examination was made and no history was taken of the patient. He returned again on May 14, 1976, accompanied by Lawrence Antoine. The doctor looked at the patient card and told him that he came back too early, and not to come back until the month was up. On June 3, 1976, Claude Smith came back accompanied by Agent Phoenix Price (undercover name Phoenix O'Day). The doctor remarked after weighing him that he had gained four pounds. Agent Price said he might need different pills and defendant gave him two white envelopes containing thirty Phendimetrazine and sixty Ionamin (Counts VI and VII of the Indictment). No other medical examination or tests were performed on the patient. He returned to the doctor's office nine months later on March 10, 1977, and the doctor gave him 90 Phendimetrazine and 50 Ionamin and a prescription for 60 Placidyl tablets (Counts XVII and XIX of the Indictment). Other than taking his weight, no other medical examination or tests were performed on the patient.

## PHOENIX PRICE

Officer Phoenix Price (undercover name Phoenix O'Day) saw the defendant on only one occasion, June 3, 1976. After defendant's assistant obtained a picture identification card,[8] he was ushered into the inner office together with two black female persons who also indicated that they were present for the weight program. The defendant entered along with another female patient to whom he stated, "I can't write prescriptions for Preludin." (Tr. p. 225). Nevertheless, he gave this patient some pills. Agent Price told the doctor he need-

---

6. Her address was listed as P.O. Box 3084, Thibodaux, Louisiana, a distance of approximately 43 miles from Amite, Louisiana.

7. His address was listed as 128 A, Houma, La., a distance of 60 miles from Amite, and also as 924 Caffin, Baton Rouge, Louisiana.

8. His address is listed as 2007 Kuebel St., New Orleans, Louisiana.

ed "some speed diet pills." The doctor asked him if he was there for the weight program and when he responded "yes," he told Agent Price that he didn't look overweight. The doctor then gave Agent Price and the two other females his short lecture on weight reduction and upon concluding said "Do not ask for any kind of Preludin, Eskatrols or Biphetamines or any other type of drug," and the only type of thing he was going to give out today was Ionamin. (Tr. pp. 225–226). Agent Price thereafter was given 56 Phendimetrazines and 60 Ionamins (Counts VIII and IX of the Indictment). Other than weight and blood pressure, no other medical tests or examinations were performed on him. Since Agent Price and the two other individuals were new weight patients, there seems to be no explanation for the fact that the doctor was concerned that they would ask for certain scheduled drugs, as one could hardly expect *bona fide* weight patients to make such an inquiry.

## PETE MUNSTER and DAVID BOYCE

Agent Peter Munster (undercover name Patrick Marshall)[9] first saw Dr. Rosen on March 10, 1977. He was accompanied by Ronald F. Bittola, an acquaintance of the doctor who had worked for him on occasions. After being ushered into the inner office and weighed with his coat on and his blood pressure taken, he was advised that his blood pressure was too high to get pills. Bittola went into another room and told the doctor Munster would not cause any trouble. Dr. Rosen returned to the inner office, retook his blood pressure, noted that it had now dropped 10 points and thus he could give him pills. Munster was given a minute and a half lecture on weight reducing during which time Dr. Rosen was winking and smiling. At the conclusion of the so-called lecture, Dr. Rosen asked what Munster was taking and when he replied nothing, the doctor said, "Good, I can give you Biphetamines. They are in short supply." He gave Munster a prescription for 31 Biphetamines

and a package containing 90 Phendimetrazines and when he asked the doctor if these would keep him awake, he was given a prescription for 60 Placidyls (Counts XV, XVI and XVIII of the Indictment) (Tr. p. 378). The doctor knew he was under surveillance by the local sheriff and was concerned that his office might be bugged and his telephone tapped. Bittola advised the doctor that Munster was an expert in the field of bugging and arrangements were made for him to return with his equipment to check out the office. On March 15, 1977, he returned with Agent David Boyce (undercover name James David Stephens)[10] and proceeded to check out the office with a bogus electronic debugging device. While Munster was doing this Agent Boyce asked the doctor if he could get some pills. The defendant made some notations on a 3 × 5 card and wrote Agent Boyce a prescription for 60 Biphetamines (Count XX of the Indictment). Agent Boyce did not receive a lecture on losing weight, nor was his blood pressure taken. The doctor was advised that no bugs were found in the office, and they needed additional equipment to check out the phones for taps. Boyce asked for some more pills like Munster got and he gave him a prescription for 60 Placidyls (Count XXI of the Indictment). Munster asked for more pills. The doctor told Munster that he would take care of him two days later when he returned with the equipment to check on the phone taps. On March 17, 1977 the agents returned and proceeded with their bogus check for phone taps. They placed a fake tap on an outside phone box and then showed it to the doctor. He was pleased, had his picture taken by it and indicated he would notify the F.B.I. Munster and Boyce asked for pills and each received from the doctor a package of 60 Ionamins (Counts XXII and XXIV of the Indictment). He told them if they were stopped by police to say they had received a two months' supply because they were going to be out of town. They then went out to their truck and returned and asked for

---

**9.** His address is listed as 2468 Dauphine Street, New Orleans, Louisiana.

**10.** His address is listed as 3864 St. Charles Avenue, New Orleans, Louisiana.

"those sleeping pills." The doctor gave them each a prescription for 60 Placidyls (Counts XXIII and XXV of the Indictment). Neither one of these agents was charged for his prescription and pills.

Thus, insofar as concerns the dispensing of controlled substances to Munster and Boyce on March 15, and March 17, 1977, there was not even a pretext that they were given for legitimate medical purposes. They were dispensed to the agents in return for the doctor's belief that they had performed a service for him in locating a suspected telephone tap.

### DR. JOHN ADRIANI

The Government elicited testimony from Dr. John Adriani, a medical doctor, a pharmacologist of national prominence, a teacher and a prolific writer. The Court recognized him as an expert. He testified that it would not be legitimate medical practice: for a patient to suggest to a doctor what pills should be prescribed; to prescribe a several months' supply of stimulants to obesity patients who say they will be out of town; to prescribe a stimulant drug and automatically prescribe a depressant drug along with it; to prescribe drugs to a patient the physician thought was abusing the drug. He further testified that if someone was treating a patient for obesity and prescribing appetite suppressants he should require the patient to come back in two weeks to see how he was doing; that it would not be expected that a doctor would use nicknames for drugs in discussing treatment with patients; prior to prescribing these drugs, it would be necessary to take a history of the patient and particularly, he would want to determine if the side effects of the drugs might affect the patient. In addition he testified that Biphetamines and Amphetamines were dangerous and are to be used in weight reduction programs only when alternative therapy has been ineffective; use for prolonged periods could lead to drug dependency and should be avoided; particular attention should be paid to the possibility of patients obtaining such drugs for a non-therapeutic use or distribution to others, and thus should be prescribed or dispensed sparingly. With regard to particular drugs he testified: Placidyls should be administered with caution to patients with suicidal tendencies and large quantities of the drug should not be prescribed; Placidyl has a potential for the development of psychological and physical dependence; prolonged administration of the drug is not recommended; Phendimetrazine is related chemically and pharmacologically to the amphetamine drugs, and the possibility of its abuse should be kept in mind when evaluating the desirability of including it as a part of a weight reduction program; Ionamine is related chemically and pharmacologically to amphetamines, and the possibility of its abuse should be kept in mind when evaluating the desirability of including it as part of a weight reduction program (Tr. 533–537).

Dr. Adriani was asked questions in hypothetical form, detailing the circumstances heretofore set out pursuant to which all of the undercover agents obtained drugs from Dr. Rosen. He categorically stated that the dispensing and distribution of the controlled substances as set forth in the hypothetical questions (and the Court finds that the facts set out in the hypothet were proved in the evidence) were not dispensed in the course of professional practice and for legitimate medical reasons.

### DR. JAMES CARTER

Dr. James Carter, an expert called by the defense, actually supports the testimony of Dr. Adriani with respect to ascertaining whether it can be considered that Dr. Rosen dispensed the pills for legitimate medical purposes. Dr. Carter's testimony assists the defendant only to the extent that he testified that the controlled substances dispensed by Dr. Rosen could be used in a weight reduction program for a limited period of time. However, that is not the question to be resolved in the instant case. It is not whether or not the drugs *may* be prescribed *vel non* for a weight reduction program, but whether Dr. Rosen dispensed them for this purpose on the occasions here-

tofore described. The following testimony of Dr. Carter supports the Government's position that the drugs were dispensed improperly. Dr. Carter testified that weight, height and blood pressure of a patient would not be sufficient information to determine the cause of obesity; he does not now write prescriptions for appetite suppressants, but he might in a future weight clinic to be developed at Tulane Medical School prescribe them; however, such prescriptions would limit the use of these pills for 30 days and he would require the patient to be checked at two-week intervals; when asked a hypothetical question setting forth the facts of Agent Boyce's visits to Dr. Rosen, he was of the opinion that the doctor did not have sufficient evidence to prescribe the 60 Biphetamines given to Boyce unless he made some complicated computations (Tr. p. 683). Additionally, when being presented with a hypothet describing the additional pills given to Boyce two days later (Counts XXII and XXIII of the Indictment) Dr. Carter said, "This is entirely too much medicine to give to one person at one particular time." (Tr. p. 685–686).[11] Finally, Dr. Carter testified that he would not automatically prescribe a depressant together with a stimulant unless he had the opportunity to wait and see if the patient had any problem with the stimulant (Tr. p. 685).

## DR. ISADORE ROSEN (the defendant)

The defendant, Dr. Rosen, took the stand to testify in his own behalf. Dr. Rosen is a very articulate person with an excellent and soothing speaking voice. He rambles on and on in an attempt to beguile the listener with medical terms and his impressions and feelings generally. However, to use a metaphor (which seems appropriate in the context of this case) when one digests and dissects the defendant's testimony, it tends,

like Dr. Carter's, to support the Government's case rather than exculpate him. Specifically, the Court does not for one moment believe that the doctor's stereotyped weight reducing "lecture" was the one which he claimed to give and as set out on pages 723, 724, 725, 726, 727, and part of page 729 of the transcript. The Court is of the opinion that the stereotyped weight reduction "lecture" was given in the short, terse manner described by the various agents. Moreover, when the Court was forced to listen to the tape recording taken by Agent Munster (Exhibit D–10), it heard the doctor's lecture. Although it contained a few of the subjects mentioned in the doctor's testimony it bears no relation whatsoever to the lengthy discourse which the doctor detailed in his testimony as his weight lecture. This, and considering the doctor's testimony as a whole, causes the Court to place little reliance on the defendant's testimony. Further, the doctor's attempt to explain away the fact that he took the blood pressure of a patient on the first visit to determine whether or not he could be given the type of drugs he was prescribing, but was not concerned with taking the blood pressure on all return visits, is incredible, confusing, and not to be believed (Tr. 771–777). The doctor testified that he would never give drugs to a person whom he thought would misuse them. This is contrary to his dispensing pills to Agent Antoine (posing as Mr. Angelo) on two occasions after he stated he had given them to his girl friend. Defendant's attempts to extradite himself from this untenable position is likewise incredible testimony (See Tr. pp. 780–786). In this same context, perhaps an excellent example of what the doctor's real thought process was is demonstrated by the following excerpt from his testimony:

"Q. What dosage unit, how many was he to take?

11. The defense contends that the tape D–10 contains a conversation to the effect that the agents told the defendant they needed extra pills for the reason that they were unable and/or were frightened to come back to Tangipahoa Parish for quite a while. The Court did not hear such on the tape. Assuming *arguendo*

that such a conversation took place, it would not affect the Court's decision because, for the reasons heretofore stated, the Court is of the opinion that the initial as well as all subsequent dispensing of the drugs was not in good faith for legitimate medical purposes.

A. Two a day.

Q. Two a day?

A. 60.

Q. Okay. And, what did you think of his coming back within fourteen days?

A. I thought he was a screwball.

Q. What do you mean by screwball?

A. He probably wanted more of them. Maybe he was taking three or four a day or giving them away, and I wouldn't give it to him.

Q. By your saying you thought he was a screwball, you thought he was abusing the Biphetamine?

A. Exactly.

Q. But you told him to come back in fourteen more days?

A. That's right.

Q. Why did you tell him to come back in fourteen days if you thought he was abusing them?

A. Because he might not be abusing them in fourteen days when he found out I was not giving him any more.

Q. Mr. Ronald Harris, I ask you to look at that exhibit, Exhibit No. 41, Doctor.

A. Yes.

Q. Now, do you remember this particular Agent when he testified? His real name was Claude Smith. He testified last week.

A. I think he was the black man who testified. I recall only from being up here.

Q. Then you wouldn't recall as to whether or not when you asked him what he wanted on his first visit and he said Preludin, or you wouldn't recall whether you asked him if he wanted Preludin?

A. I wouldn't know. When they are black I usually ask them because that's all they want, some stuff to stick in their vein."

The testimony relative to the giving of pills to Ronald Harris (Tr. 788–793) demonstrates clearly that there was no methodology in the doctor's dispensing of drugs.[12] He would prescribe them if a person lost weight or gained weight. The witness's explanation of why he required picture I.D.'s prior to prescribing drugs for controlled substances makes no sense whatsoever (Tr. 795–798).

█ The Court is of the opinion that although Dr. Rosen has a medical degree and may have practiced medicine in the past, his primary business today is dispensing controlled substances. This does not mean that everyone who comes to Dr. Rosen to obtain drugs intends to abuse them; however the Court is of the opinion that Dr. Rosen is not concerned what a person does with the drugs he dispenses or prescribes as long as he can be paid for such. If a patient wants pills for weight control, Dr. Rosen gives them a prescription and/or the pills. If a person wants controlled substances to satisfy his craving or for other purposes, Dr. Rosen likewise gives or prescribes them to him. Dr. Rosen has a very clever operation. It is designed to give the appearance of legitimacy and to camouflage his activities and real purpose, that is, dispensing of controlled substances for profit. It were as if Dr. Rosen had read the lead cases on the subject to ascertain what procedures and actions he should adopt and follow to create the impression of dispensing these drugs for medical purposes in the event law enforcement officers attempt to check or question his activities. His facade includes an initial checking of blood pressure, but no checking of blood pressure on a subsequent visit, determining the height and weight of the patient, a so-called lecture on weight control and in most cases handing the patient a pamphlet on weight control and sometimes chiding a patient when others are present about not losing weight.[13] But there it ends. A patient

12. Other than, in most instances, not dispensing drugs in less than 30-day intervals.

13. There is a minority view among physicians that Amphetamines may be used in controlling obesity, provided they are prescribed for a

gets his pills (although maybe not the particular type) on request and perhaps "uppers" and "downers" at the same time; he gets pills if he loses weight or if he gains weight, provided he helps the doctor keep his record clear by not attempting to obtain more drugs in less than 30-day intervals. Dr. Rosen has developed a scheme wherein he believes that form will prevail over substance. However, insofar as concerns charges in the instant indictment, the diligent and painstaking operation of the undercover agents has served to pierce this thin veil by which the defendant sought to shield his illegal activities. The evidence demonstrates beyond a reasonable doubt that the dispensing of the controlled substances to them was not in good faith and for legitimate medical purposes. Moreover, insofar as agent David James Boyce is concerned, he did not even have his blood pressure taken or receive the so-called weight control lecture, yet he was dispensed the controlled substances set forth in Counts XXI, XXII, XXIII and XXIV of the Indictment. There was not even any pretext that the sixty Placidyls given to Munster on his return visit were for weight control (Count XXV of the Indictment). These drugs were obviously dispensed to those agents in return for a service Dr. Rosen thought they had performed for him.

Pursuant to similar, but less compelling facts and circumstances as set out hereinabove, doctors have been found to be guilty of dispensing controlled substances in violation of law. *United States v. Brandenburg*, 155 F.2d 110 (3rd Cir. 1946); *United States v. Bartee*, 479 F.2d 484 (10th Cir. 1973); *United States v. Ellzey, M.D.*, 527 F.2d 1306 (6th Cir. 1976); *United States v. Viglia, M.D.*, 549 F.2d 335 (5th Cir. 1977).

Accordingly, the Court is of the opinion that based on all of the aforesaid, the Government has proved beyond a reasonable doubt that defendant is guilty on all counts of the Indictment. Therefore,

---

short period of time. Also it is no doubt true that weight is lost by exercising and reducing calorie intake, aided by drinking water and

IT IS ADJUDGED that the defendant is guilty as charged on Counts I through XXV, inclusive, of the Indictment herein.

chewing food slowly. However, these truisms are insufficient to give legitimacy to the doctor's activities as outlined herein.